# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### AUGUST SESSION, 1998

FILED

November 4, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9709-CR-00438** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **WILSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. J.O. BOND** |
| **WILLIAM D. STOCKWELL,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | **(Direct Appeal - First Degree Murder)** |

FOR THE APPELLANT:

B. F. LOWERY
Public Square, Lowery Bldg.
Lebanon, TN.. 37087

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

TIMOTHY F. BEHAN
Assistant Attorney General
425 5th Avenue North
Nashville, TN. 37243

TOM P. THOMPSON, JR.
District Attorney General

ROBERT HIBBETT
Assistant District Attorney
111 Cherry Street
Lebanon, TN. 37087

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

On December 19, 1996, a Wilson County jury found Appellant, William D. Stockwell, guilty of first degree murder in the death of his newborn son. The trial court immediately imposed a sentence of life imprisonment. Appellant appeals from his conviction, raising three issues:

      1) whether the evidence was sufficient to support a conviction for first degree murder;

      2) whether the trial court erred in failing to make a conclusive determination of the voluntariness and admissibility of Appellant's alleged confession prior to the submission of the statement to the jury; and

      3) whether the trial court erred in allowing the State to introduce into evidence the involuntary statement of Appellant as well as the testimony of Detective David Kennedy at the trial concerning the taking of the statement.

After a review of the record, we affirm the judgment of the trial court.

## FACTS

On Thursday, May 11, 1995, Appellant received a call from his girlfriend, Lisa Murphy, at approximately 6:45 in the morning. Ms. Murphy, who Appellant knew to be pregnant with his child, called to say that her water had broken. Appellant went to Ms. Murphy's house and picked up Ms. Murphy and her younger sister. The couple transported Ms. Murphy's sister to school. Appellant then took Ms. Murphy to a farm that his parents owned on Sherrilltown Road. He left her there in an old decrepit travel trailer, and returned home so that no one would notice that Ms. Murphy did not go to school. He returned to the farm, reportedly around 9:00 am, to find Ms. Murphy in labor. The couple delivered the baby in the floor of the trailer.

According to Ms. Murphy, the baby was born alive, though Appellant told her the cord was around the infant's neck during delivery. Ms. Murphy tied off the child's cord with thread and cut the cord with scissors she had with her. She reported that the child cried as it was delivered and was a purplish-reddish color. She further testified that Appellant took the child from her, wrapped it in a jacket, and took it to his truck, where there was a heater. He came back to the trailer and helped her to the truck where she sat and held the infant. She testified that the infant cried and slept, breathing normally. The couple discussed what to do with the child; they considered taking it somewhere and leaving it, but decided it would eventually be traced back to them. Ms. Murphy reported that Appellant several times mentioned the possibility of burying the child. The two discussed their dilemma for 15 to 20 minutes, and then Appellant got out of the truck, took a shovel, and went into the barn. When Appellant returned from the barn, he took the baby from Ms. Murphy and carried it into the barn. Ms. Murphy testified that the baby cried as Appellant carried it. Appellant returned in a few minutes without the baby, telling Ms. Murphy that the baby had died.

The couple spent the rest of the day together, acting as if nothing out of the ordinary had occurred. They went shopping and then had dinner with Ms. Murphy's family.

According to Appellant, the baby was born with the cord around its neck. In a statement made at the time of his arrest, he stated that he thought that perhaps the child moved a little. He said that it seemed that the baby was alive when Ms. Murphy cut the cord, but it was blue in color. He testified at trial that he attempted to revive the infant by placing his finger in the baby's mouth and trying

to clear its throat. He stated that both he and Ms. Murphy determined that the baby was dead, and that they jointly decided that the baby should be buried. Appellant admitted to digging a grave and burying the baby.

When Ms. Murphy returned to school the Monday following the birth, a teacher noticed that she was no longer pregnant. The teacher asked a friend of Ms. Murphy's, Judy Williams, if Ms. Murphy had delivered the baby. Ms. Williams responded that the baby had died after being born with the cord around it's neck. The teacher went to the school principal who called law enforcement. The detective assigned to the case wired Ms. Williams in order to tape a conversation between her and Ms. Murphy regarding what had occurred. The taped conversation was only partially audible, but Ms. Williams reported that Ms. Murphy told her that the baby boy was buried in a barn in Cherry Valley. Officers determined that Appellant's parents owned the property described and obtained permission to search the property. The officers located the buried infant.

An autopsy performed by the County Medical Examiner revealed that the child was full term and properly developed. The child's esophagus, trachea, and stomach contained liquefied brownish grey dirt. The child's lungs floated very well in water, which the medical examiner testified indicated that the chid had been born alive. The bronchi of the child's lungs were blocked with a brown material, and the alveoli contained "brown amorphous aspirated material," which was consistent with the material in the child's stomach. The medical examiner determined that the cause of death was "mechanical airway obstruction due to inhalation and ingestion of dirt." The Federal Bureau of Investigation lab

determined that the soil recovered from the infant was consistent with soil from the child's grave.

Detective Kennedy observed the autopsy of the baby, after which he returned to the Sheriff's office and re-read the statements by Ms. Murphy and Appellant. Upon reading them, he decided to again question Appellant as to whether the baby had been alive. At approximately 1:00 in the morning, Detective Kennedy awoke Appellant and led him to an interrogation room for further questioning. Appellant signed a rights waiver. Detective Kennedy testified that Appellant then told him he wished to change his statement to reflect that the baby was alive at the time he buried it. Detective Kennedy stated that he wrote out the statement for Appellant, but Appellant refused to sign the statement. Detective Kennedy testified that he told Appellant that he, Detective Kennedy, would testify as to what Appellant had told him even if Appellant did not sign the statement.

Appellant's version of that night's events differed from that of Detective Kennedy significantly. He testified that Detective Kennedy asked him if he wanted to change any part of his statement and that he responded that he did not. He said that Detective Kennedy wrote a statement and read it back to him, again asking if he wanted to change his statement. Appellant testified that he unequivocally told the detective that he did not wish to change his statements and that he asked for an attorney. Appellant further testified that Detective Kennedy told him that he, Detective Kennedy, was studying to be an attorney and that in his opinion Appellant should sign the statement.

## I. Sufficiency of the Evidence

Appellant initially contends that the State failed to present evidence sufficient to support the jury's conviction of murder in the first degree, alleging specifically that the State failed to prove the elements of premeditation and deliberation. When an appellant challenges the sufficiency of the evidence, this Court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with Appellant to demonstrate the insufficiency of the convicting evidence. Id. On appeal, "the [S]tate is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Harris, 839 S.W.2d 54, 75; Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Mathews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, this Court may not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." Id. at 779. Finally, the

Tennessee Rules of Appellate Procedure, Rule 13(e) provides, "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact beyond a reasonable doubt." *See also* State v. Mathews, 805 S.W.2d at 780.

In State v. Brown, 836 S.W.2d 530 (Tenn.1992) and State v. West, 844 S.W.2d 144 (Tenn.1992), our Supreme Court discussed the then existing elements of first degree murder. In Brown, the Supreme Court acknowledged that the Tennessee courts have often blurred the distinction between the elements of premeditation and deliberation. The Court relied upon the following historical definitions:

> "Premeditation" is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and "deliberation" is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. "Deliberation" is present if the thinking, i.e., the "premeditation," is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a "careful weighing" of the proposed decision.

Brown, 836 S.W.2d at 540-41 (*quoting* C. Torcia, Wharton's Criminal Law § 140 (14th ed.1979) (emphasis in original)); *see also* State v. Gentry, 881 S.W.2d 1 (Tenn. Crim. App.1993).

Premeditation as defined by the Supreme Court requires evidence of a "previously formed design or intent to kill," and deliberation requires "some period of reflection, during which the mind is free from the influence of excitement or

passion." West, 844 S.W.2d at 147. Moreover, to insure that the elements would be considered separately, in Brown the Court decided to abandon the commonly given instruction that premeditation could be "formed in an instant." Brown, 836 S.W.2d at 543. In State v. Gentry, while holding that the jury may infer premeditation and deliberation from the circumstances surrounding the killing, the Supreme Court, outlined the proof from which a jury might rationally infer the elements of first degree murder:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity;
>
> (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
>
> (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993) (*quoting* 2 W. LaFave and A. Scott, Substantive Criminal Law, § 7.7 (1986)); *see also* State v. Hall, 1997 WL 769174, 118-119 (Tenn. 1997).

In the matter sub judice, proof was presented that Appellant wanted rid of the baby "someway, anyway." Further proof showed that Appellant refused to take Ms. Murphy to a hospital, but rather took her to a remote location to give birth so that no one would find out about the child. Because premeditation and deliberation are elements are mens rea elements, elements which pertain to the mental state of the perpetrator, the only way a jury can find such elements is usually through circumstantial evidence, through examining Appellant's actions

for evidence of what was in his mind as he acted. The evidence showed that the Appellant left Ms. Murphy at the abandoned trailer for over an hour during which her labor started. The child was born alive and Appellant took a shovel and dug a shallow grave before taking the baby from its mother. All of this evidence supports the finding of premeditation and deliberation. This issue is without merit.

## II. Determination of Voluntariness and Admissibility of Statement

Appellant also argues that the trial court erred in refusing to determine pretrial whether Appellant's statement to Detective Kennedy was voluntary. Detective Kennedy and Appellant both testified at a pretrial hearing regarding Appellant's motion to suppress the statement. The trial court overruled Appellant's motion and allowed the State to present the statement to the jury through the testimony of Detective Kennedy. The trial court ruled that Appellant's contention that he never made the statement was a fact question for the jury rather than a question of voluntariness for the trial court to determine. We agree. Appellant has not contested the rights waiver which he signed. Neither has he indicated that he was mistreated or threatened into making a statement. He merely contests the authenticity of the statement. The question of whether Appellant actually made the statement at all is a relevant fact question to be resolved by the trier of fact, the jury.

## III. Introduction of Statement

Appellant further alleges that the trial court erred in allowing the State to present the contested statement to the jury through the testimony of Detective

Kennedy. We disagree. Appellant's argument seems to be based on the lack of verification of the statement allegedly made by Appellant to Detective Kennedy. Appellant was allowed to cross-examine Detective Kennedy at length regarding the authenticity of the document, the conditions under which it was authored, and whether the detective was truthful in his version of the events. Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, and well as factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Cabbage, 571 S.W.2d 832, 835(Tenn. 1978). The jury has spoken. This issue is without merit.

Accordingly, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE

CONCUR:

_____
DAVID H. WELLES, JUDGE

_____
JOHN K. BYERS, SENIOR JUDGE